GEORGE F. TUTTLE et al., executors &c

*v.*

FREDERICK FRELINGHUYSEN.

On October 26th, 1881, one Baldwin, who was one of the executors and the general financial manager and custodian of the securities of an estate, and also the cashier of a national bank, purchased four bills of exchange for $6,535 each, dated October 16th, 19th, 21st and 24th, 1881, payable in six months, which had been accepted by the drawees and were made payable to the drawers and endorsed by them. Baldwin, to pay for the bills, drew from the bank on his check as executor, $25,000, from the deposit to the credit of the estate, and placed in the box containing the papers of the estate, usually kept in the cashier's desk in the bank, the four drafts, with this memorandum attached: "Est. W. James, loan $25,000, Oct. 26th, 1881.   C. Nugent & Co." The proceeds of the drafts were applied to the drawer's indebtedness to the bank. The bank failed on October 31st, 1881, and the defendant was appointed receiver on November 2d, 1881. He gave to the executors the box and all its contents, except the four drafts, which he kept, claiming that they were the assets of the bank. He refused to deliver them on demand, and collected them at maturity, but kept the proceeds separate.—*Held*, that Baldwin, in the purchase of the drafts, acted as the agent of the drawers and as executor and not as cashier, and though the drafts were paid for by law with funds which the estate had on deposit in the bank, and though Baldwin knew at the time that the bank was insolvent, yet the transaction being a *bona fide* purchase and not a plan to secure preference of the estate over other depositors, the transaction was not in violation of section 5,242 of the revised statutes of the United States, which forbids the transfer of any bills of exchange &c., owing to any national bank   *   *   *   after the commission of any act of insolvency, or in contemplation thereof; and, further, that this court has jurisdiction to follow the proceeds of the drafts as trust property so long as they are identifiable, and to decree their payment to the estate.

---

Bill for relief. On final hearing on pleadings and proofs.

*Mr. Cortlandt Parker*, for complainants.

*Mr. A. Q. Keasbey*, for defendant.

THE CHANCELLOR.

This suit is brought by the executors of William James, deceased, late of Newark, to establish their right to four bills of exchange, each for $6,535, drawn by C. Nugent & Co., of Newark, upon and accepted by L. Beebe & Sons, of Boston, and payable to the drawers, and by them endorsed. They were all payable six months from date, and were respectively dated the 16th, 19th, 21st and 24th of October, 1881. Oscar L. Baldwin, one of the executors, who was the general financial manager of the James estate and the custodian and depositary of its securities, was also cashier of the Mechanics National Bank of Newark up to the time of its failure, which occurred on the 31st of the last-mentioned month of October. The defendant was appointed receiver of the institution about the second of November following. When he took possession of the bank building he found the drafts in question in a box kept in a desk—the cashier's desk—used by Baldwin in the bank, where it had been left by the latter. The box contained nothing but papers of the estate, or what purported to be such. Among them were two packages of bills receivable, besides the drafts in question, and also bonds of the estate. On the packages of bills receivable were memoranda stating that they belonged to the James estate. To that which was composed of the drafts in question there was attached a paper containing the following memorandum in the handwriting of Baldwin : "Est. W. James, loan $25,000, Oct. 26th, 1881. C. Nugent & Co." The receiver gave up to the executors the box and all its contents, except the four drafts, which he says he felt constrained to retain until after proper judicial determination as to the ownership thereof. Formal demand was made verbally by the executors on him for the drafts, and subsequently, on the 13th of April, 1882, they made a written one. The demands were refused. When the latter one was made the defendant had sent the drafts to Boston for collection on his account. On the 26th of October, 1881, the date of making the loan, as stated on the memorandum attached to the drafts, Baldwin drew from the bank, on his check, as executor of William James,

$25,000 on account of the deposit ($54,497.91) to the credit of the estate there. The defendant, as appears by his answer, collected the drafts as they matured, and now holds the proceeds thereof as part of the assets of the bank, as he claims he has a right to do, but keeps them in a separate account, so that upon adjudication of ownership in this court the identical moneys can be subject to the order of this court. By his answer he sets up two defences: one is that the purchase of the drafts for the James estate was not *bona fide*, but was in contravention of the provisions of the five thousand two hundred and forty-second section of the revised statutes of the United States, which declares that all transfers of the notes, bonds, bills of exchange or other evidences of debt owing to any national banking association, or of the deposits to its credit, * * * made after the commission of an act of insolvency, or in contemplation thereof, with a view to prevent the application of its assets in the manner prescribed by the national banking act, or with a view to the preference of one creditor over another, except in payment of its circulating notes, shall be utterly null and void. The other defence is that if the purchase be sustained, this court has no jurisdiction of the matter, because there exists an adequate remedy at law.

That Baldwin bought the drafts with the money of and for the James estate, on the 26th of October, 1881, there can be no question. It is also clearly proved that they were the property of C. Nugent & Co., and not of the bank, and that the $25,000 were at once applied to the payment of the indebtedness of that firm to the bank. The drafts were intrusted by the firm to Baldwin in order that he might negotiate them and apply the proceeds for their benefit in their dealings with the bank from which they were borrowers of money. He testified that he acted as agent for them in the negotiation of their business paper, and that it was and had for years been their custom to send to him every day the general receipts of their business, in order that he might deposit such of them as were cash to their credit in the bank, and negotiate such of the paper as was not cash in the bank or elsewhere as he could; that the understanding was that they were to endorse such paper to him, and he was to turn it

into cash for their benefit as soon as possible, and either deposit the proceeds in the bank or use them in taking up their obligations at the bank. He received commissions for negotiating the paper. The four drafts were received, he says, on the 26th of October, the day they were negotiated, just as such paper, together with cash items, had been received by him from the firm for several years theretofore. The bank was then insolvent, and he was well aware of the fact. He was in hopes, however, to be able, by management, to prevent the failure of the bank at that time by preventing the bank examiner, of whose coming he was in daily expectation, from discovering the insolvency. He says, in substance, that he expected, or at least hoped, to be able to prevent the discovery up to the night of the 29th of October, three days after the purchase of the drafts. The proceeds of the drafts he used to take up worthless paper, what is known as "kites" (they were drafts drawn by C. Nugent & Co. on a firm in New York, without warrant, and not based on any indebtedness or liability of the drawers), representing loans by the bank to C. Nugent & Co., which he was carrying in his cashier's cash account as so much cash. There is no evidence whatever that in the purchase of the drafts he contemplated any benefit to the estate of James, except that which would arise from the investment itself. There is no evidence that he contemplated obtaining any preference for that estate over the other creditors of the bank. His sole object appears to have been to get the money for the drafts for C. Nugent & Co., whose property they were, from the funds of the James estate in the bank, and apply it to the indebtedness of the firm to the bank. At the same time he thought the purchase a very desirable investment for the estate. If he had offered the paper to any person on the street to whom the bank was indebted as a depositor, and that person had bought it with a check on the bank which the cashier paid, there could be no ground for holding that the bank had been guilty of a violation of the above-quoted section of the national banking act, in the transaction. And there is no essential difference between the transaction under consideration and such a one as that. The purchase was not within either the terms or spirit of

the section.  It was not a transfer of any of the notes, bonds, bills of exchange or other evidences of debt owing to the bank; for, as before stated, the drafts were not the property of the bank.  Nor of any deposits to its credit; for the money due the James estate from it was a deposit to its *debit*.  Nor is there any ground for holding that the object of the purchase was to prevent the application of any of the assets of the bank to its debts in the manner provided for by the national banking law, or to give a preference to the James estate as a creditor of the bank.  But Baldwin's sole object and design, as cashier, in the transaction, were to get the money for the drafts to take up the worthless paper before referred to—to substitute cash for it —before the examiner should enter upon his investigation of the affairs of the institution.'

Nor is the objection of want of jurisdiction well founded.

The defendant, who in this transaction stands as a mere volunteer, took into his possession property (the drafts) impressed with a trust, and he held it subject to the trust.  He collected the money due upon the drafts, and now holds it, keeping it, in the language of his answer, in a separate account, so that upon adjudication of ownership the identical money may be subject to the order of this court.  When the bill was filed (April 18th, 1882) he held the drafts, none of which had then matured.  He has collected them since then.  The bill prays that it may be decreed that he came into and holds possession of them wrongfully and without lawful right to take or hold them, and that he acquired them under and charged with a trust, whereby it became his duty to hold and collect them, and on such collection to hold the proceeds in trust for the complainants, and that he be prevented from paying over such moneys as he shall receive from the drafts to any one except the complainants, or from making use thereof as his own, and from intermingling them with assets or property held in trust for any other person, or rendering an account thereof to any other person as such.  On the same day on which the bill was filed an injunction, according to its prayer, was ordered, and it was issued two days afterwards. The drafts were trust property, the property of the James estate,

which the defendant took into his possession (with notice) as property belonging to the bank, and the executors sought by this suit to recover them.   At the filing of the bill the property was still in the form of drafts.   The fact that since then the money due on the drafts has been collected can make no difference as to the complainants' right to relief in this court.   Especially is this so in view of the fact that the defendant has kept the proceeds by themselves, capable of identification, to answer the decree of this court.   But, further, the defendant has no personal interest in the matter.   He is acting merely as a trustee, and, in what he regarded as the proper discharge of his duty as such, took the drafts into his possession and held them as the .property of his trust estate.   If satisfied that they were such property, he would not only have felt at liberty to distribute the proceeds among those entitled to the assets of the bank, but it would have been his duty to do so, and he probably would have done it if not restrained by legal proceedings on the part of the complainants. The proper proceedings to that end were those in which he could be restrained by injunction from disposing of the property by distribution or otherwise, and could be required to hold it or its proceeds subject to judicial determination as to its ownership. He held the property and now holds its proceeds under a trust arising by operation of law.   Trusts are enforced not only against those persons who are possessed of the trust property rightfully as trustees, but also against all persons who come into possession of the property bound by the trust with notice of the trust.   *2 Spence's Eq. Jur. 194.*   In other words, the holder of trust property becomes a trustee of it as soon as he has notice that it is trust property.   Not only can the trust property be followed into the hands of third persons, but the proceeds may be followed also as long as they can be traced and identified. *Perry on Trusts § 835.*   Finding the drafts in the bank building, and in the possession of the cashier, the defendant, assuming that they were the property of the bank, claimed them as such, denying that they were the property of the James estate, notwithstanding the ear-mark upon them, and notwithstanding they were found among the securities of that estate, in a recep-

tacle devoted to and used for the keeping of its papers, and notwithstanding, also, that the cashier was an executor of that estate, and it was evident that the estate had bought and paid for the drafts. He thus put the complainants to the proof that the drafts were such trust property, and the object of this suit is to establish that fact. This court, it is needless to say, is the proper forum for the purpose. I have no doubt whatever of its jurisdiction in the matter, nor of the propriety of having recourse to that jurisdiction in this case. The complainants are entitled to a decree for the amount of the proceeds of the drafts, with interest thereon from the time when they were collected, and they are entitled to costs.